**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-CV-22886-RAR**

**VIMBOL CAPITAL LLC**, *et al.*,

      Plaintiffs,

v.

**GILS AUBRY**, *et al.*,

      Defendants.

_____/

**ORDER DENYING MOTION TO DISMISS**

**THIS CAUSE** comes before the Court on Defendants' Joint Motion to Dismiss Plaintiffs' First Amended Complaint ("Motion"), [ECF No. 22], filed on October 30, 2025. On November 13, 2025, Plaintiffs filed their Opposition to Defendants' Motion to Dismiss ("Response"), [ECF No. 24], to which Defendants replied on November 20, 2025 ("Reply"), [ECF No. 25]. For the following reasons, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion is **DENIED**.

**BACKGROUND**

Plaintiffs Vimbol Capital LLC ("Vimbol Capital") and Jason Moreta ("Moreta") bring this action against Defendants Gils Aubry ("Aubry") and Icarus Fund LLC ("Icarus Fund"), alleging three claims arising from Defendants' "attempt to violate and circumvent the parties' 'Partnership Commission Agreement[.]" First Am. Compl. ("Complaint"), [ECF No. 18] ¶ 1. Though this Partnership Commission Agreement ("Agreement"), [ECF No. 18-1], was executed between Plaintiffs and Defendants in July 2023, Moreta and Christopher Williams[1] ("Williams")

---

[1] Though originally a party to this action, *see* [ECF No. 1], Plaintiffs' First Amended Complaint, [ECF No. 18], was only brought against Aubry and Icarus Fund, and Williams was thus terminated as a party.

first connected in Fall 2022 and began laying the groundwork for a new venture, which would eventually become Vimbol Capital, in early 2023.  Compl. ¶¶ 9–10, 13.  Moreta personally funded the formation, branding, and operations of Vimbol Capital, purchasing the domain, developing the website, and paying for critical infrastructure.  Compl. ¶ 11.

After Plaintiffs and Williams entered into an Operating Agreement for Vimbol Capital in May 2023, Plaintiffs and Defendants executed the Agreement two months later, governing "all capital markets opportunities, strategic financial introductions, and transactions sourced by either party."  Compl. ¶¶ 12–14.  The Agreement specifically included a non-circumvention clause, Section 2, providing that:

> All capital markets opportunities, including those involving institutional investors, private debt placements, and strategic introductions sourced by either party, shall be subject to the commission and referral structure outlined herein. No party may circumvent or bypass this agreement to complete transactions directly or through a third party without mutual written consent.

Compl. ¶ 15.  It also required Icarus Fund to pay Plaintiffs "67% of the amount Icarus Fund LLC gets paid for any ERC Claim Buyout Transaction" and "67% of the proceeds from Lines of Credit, Merchant Cash Advances, Asset Based Loans, Factoring, and any debt financing transaction outside of ERC."  Compl. ¶ 16 (quoting Agreement, Section 5(d)).

Plaintiffs allege that their relationship with Defendants "turned sour" after Williams misused company funds and misappropriated business revenue for personal use, while Aubry "misled interns and associates by misrepresenting their roles and the structure of the business, falsely portraying it as a standalone entity under his control."  Compl. ¶ 17.  Ignoring Moreta's efforts to formalize internal governance, Defendants, in violation of the Agreement, began circumventing Plaintiffs by transferring deal information, client communications, and CRM data from shared platforms into private systems operated solely by Icarus Fund.  Compl. ¶¶ 18–19.

And Williams and Aubry, excluding Moreta, then utilized such systems and contacts to pursue and close ERC buyouts, institutional capital raises, and debt financing transactions without paying any commissions to Plaintiffs.  Compl. ¶¶ 20–21.

In March 2025, Moreta was excluded from the business "without notice or justification[,]" and was offered a commission of 10% as a "referral partner", a "figure that had no basis in the parties' Partnership Commission Agreement and significantly undervalued Moreta's financial and operational contributions."  Compl. ¶¶ 22–23.  Plaintiffs allege that Williams and Aubry's "scheme to misappropriate Plaintiffs' business model, revenue pipeline, and backend infrastructure" was "not a single breach but a planned and continuing effort to circumvent the Partnership Commission Agreement."  Compl. ¶ 24.  As Defendants operated under the branding and structure built by Moreta, routing deals through separate entities, they "failed to account for and pay Plaintiffs the required 67% revenue share on all covered transactions."  Compl. ¶¶ 25–26.  Since Defendants' breach, "[u]pon information and belief, [they] have closed deals or are closing deals at a much higher gross revenue volume" than the $500,000 that was generated under the Agreement in the twelve months prior to the breach.  Compl. ¶¶ 27–28.  And "Defendants continue to use Plaintiffs' systems, confidential data, and branding to transact with clients originally introduced through Vimbol Capital infrastructure."  Compl. ¶ 29.

Plaintiffs claim they "are entitled to payment of their contractual revenue share, enforcement of their equity ownership, access to accounts, and an accounting of all revenues and profits derived from their systems and relationships."  Compl. ¶ 30.  In furtherance of that claim, they filed the instant case against Defendants on June 26, 2025.  *See* [ECF No. 1].  On October 10, 2025, Plaintiffs filed an amended Complaint, alleging three causes of action against

Defendants: (1) breach of contract against Icarus Fund; (2) tortious interference with business relationship against Aubry; and (3) conversion against Aubry. *See* Compl. ¶¶ 31–49.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, and the plaintiffs receive the benefit of all favorable inferences that can be drawn from the facts alleged.  *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012); *Iqbal*, 556 U.S. at 678.

A court considering a Rule 12(b)(6) motion is generally limited to the facts contained in the complaint and attached exhibits—but may also consider documents referred to in the complaint that are central to the claim and whose authenticity is undisputed.  *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009).  While the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. "Dismissal pursuant to Rule 12(b)(6) is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004) (citation and quotation omitted).

## ANALYSIS

Defendants seek to dismiss all of Plaintiffs' claims in this action on the grounds that they fail to state a claim upon which relief may be granted pursuant to Rule 12(b)(6).[2] *See generally* Mot.  For the reasons stated herein, the Court rejects Defendants' arguments that Plaintiffs have failed to state claims for breach of contract, tortious interference with business relationship, and conversion.

### I.  Count I – Breach of Contract

Defendants seek to Dismiss Count I of Plaintiffs' Complaint on the grounds that it "purports to assert a claim for breach of the Partnership Commission Agreement against Icarus [Fund] *and* Aubry[.]"  Mot. at 4.  Though Defendants acknowledge that Count I is "titled as to Icarus [Fund] only", they maintain that the "allegations under Count I consistently and inappropriately refer to 'Defendants Aubry and Icarus Fund' throughout" and that "Aubry cannot be liable for any breach of a contract to which he is not a party."  *Id*.  Defendants respond that "Count I is brought only against Icarus [Fund and that] Defendants devote pages to attacking a claim Plaintiffs never asserted against Aubry in Count I."  Mot. at 3.

Under New York law, "the essential elements of a cause of action to recover damages for breach of contract [are]: the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages[.]"  *JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 893 N.Y.S.2d 237, 239 (2010).[3]  Defendants seemingly do not

---

[2]  Defendants also posit that Plaintiffs did not comply with the requirements of Rule 10(c) by failing to attach or otherwise incorporate the Partnership Commission Agreement central to their claims.  *See* Mot. at 7; FED. R. CIV. P. 10(c).  However, in reply to Plaintiffs' assertion that "Rule 10(c) is fully satisfied" because "Docket Entry 18 includes . . . the Agreement", *see* Resp. at 2, Defendants concede that "Plaintiffs are correct, and [] therefore withdraw their argument for dismissal under Rule 10(c)[.]"  Reply at 1.  Accordingly, this argument is not before the Court.

[3]  "[The] Agreement shall be construed in accordance with the laws of the state of New York[.]"  Agreement, Section 8.

dispute that Plaintiffs have pled the requisite elements to state a claim for breach of contract against Icarus Fund—their argument focuses entirely on the fact that the underlying allegations refer to both Icarus Fund *and* Aubry, who is not a party to the contract.  *See* Mot at 4–5; Reply at 2.

A pleading is shotgun in nature where it "assert[s] multiple claims against multiple defendants without specifying which of the defendants is responsible for which acts or omissions, or which of the defendants the claim is brought against."  *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015).  And a complaint falls into this category where it "fails to provide notice of what claims each defendant must defend against." *Tran v. City of Holmes Beach*, 817 F. App'x 911, 914 (11th Cir. 2020).

Here, the Complaint clearly states that Count I is "[a]gainst Defendant Icarus Fund LLC" and that "[t]he Partnership Commission Agreement requires Icarus Fund LLC to pay Plaintiffs 67% of revenue generated from ERC claim buyouts and other financial products including lines of credit, asset-based loans, factoring, and debt financings."  Compl. ¶ 33. "Although the allegations would be more precise" had Plaintiffs directed the underlying allegations to Icarus Fund only, "[Defendants] present[] no case [law] saying that this lack of detail [] justifies dismissal."  *Pals Grp., Inc. v. Quiskeya Trading Corp.*, No. 16-23905, 2017 WL 3840359, at *3 (S.D. Fla. Sept. 1, 2017).  And Icarus Fund has been provided sufficient notice of Plaintiffs' breach of contract claim.  Accordingly, construing the allegations in the light most favorable to Plaintiffs, the Court finds that Plaintiffs' inclusion of Defendant Aubry in the allegations underlying Count I is merely a technical deficiency and not fatal to an otherwise well-pled breach of contract claim.  *See Vance v. Deloach*, No. 3:19-CV-999-J-39MCR, 2020 WL 13680408, at *3 (M.D. Fla. July 23, 2020) ("[T]he Court [does] not

normally require Plaintiff to re-plead the entire Complaint to address [minor] technical deficiencies.").

Further, Defendants argue for the first time in their Reply that Count I should also be dismissed because "Moreta is not a party to the Agreement, he is not a third-party beneficiary, and therefore he has no standing to bring forth a claim for breach of the subject Agreement." Reply at 3.  But "[a]s [the Eleventh Circuit] repeatedly ha[s] admonished, '[a]rguments raised for the first time in a reply brief are not properly before a reviewing court.'"  *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (quoting *United States v. Coy*, 19 F.3d 629, 632 n.7 (11th Cir. 1994)).  Accordingly, "[b]ecause it is improper for Defendant[s] to raise this new argument in [their] Reply brief, the argument will not be considered."  *Foley v. Wells Fargo Bank, N.A.*, 849 F. Supp. 2d 1345, 1349 (S.D. Fla. 2012).

## II.  Count II – Tortious Interference with Business Relationship

As for Plaintiffs' tortious interference claim against Aubry, "[u]nder Florida law, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff."  *Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (citation omitted).  While "[a] business relationship need not be evidenced by a contract, [] it generally requires an understanding between the parties [that the business relationship] would have been completed had the defendant not interfered."  *Id.* (internal quotation and citation omitted).  In evaluating tortious interference claims, "Florida courts draw [a distinction] between a relationship with the community at large and with an identifiable customer."  *Id*. at 1156.  Specifically, "a tortious interference claim requires 'a relationship with a particular party, and not just a relationship

with the general business community.'" *Id*. (quoting *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1191 (11th Cir. 1999) and citing *Ethan Allen, Inc. v. Georgetown Manor, Inc*., 647 So. 2d 812, 815 (Fla. 1994)).  Thus, "in order to establish the tort of tortious interference with a business relationship, the plaintiff must prove a business relationship with *identifiable* customers." *Ferguson Transp., Inc. v. N. Am. Van Lines, Inc*., 687 So. 2d 821, 821 (Fla. 1996) (emphasis added).

Here, Plaintiffs claim that they "had a valid and ongoing business and contractual relationship through the Partnership Commission Agreement, as well as with clients, lenders, and institutional partners sourced through Vimbol's proprietary systems" and that "Aubry was aware of these relationships and intentionally interfered with them [in various ways]."  Compl. ¶¶ 38–39.  Defendants attack Plaintiffs' "fail[ure] to identify a single third party with whom Aubry allegedly tortiously interfered."  Mot. at 6.  They maintain that Plaintiffs do not tie the "clients, lenders, and institutional partners" to any identifiable third party, thereby "fail[ing] to meet the specificity element in asserting a claim for tortious interference."  *Id*.  Plaintiffs respond that "Florida courts do not demand a customer-by-customer list before discovery [and that] [t]he relationships are sufficiently identified."  Resp. at 4.

Whether Plaintiffs' relationships with "clients, lenders, and institutional partners sourced through Vimbol's proprietary systems" are sufficiently identifiable presents a close call.  Compl. ¶ 38.  Courts have routinely found general allegations of "various customers" to be "too vague and abstract to satisfy the first element of a tortious interference claim." *Coach Servs., Inc. v. 777 Lucky Accessories, Inc*., 752 F. Supp. 2d 1271, 1273 (S.D. Fla. 2010); *see also BPI Sports, LLC v. Labdoor, Inc.*, No. 15-62212, 2016 WL 739652, at *3 (S.D. Fla. Feb. 25, 2016) ("[Plaintiff] avers that its allegations of tortious interference do not pertain to the community at large but, rather, for interference with the business relationships [plaintiff]

maintains with its 'present and prospective customers,' also referred to [] as its 'targeted consumer base.' For the most part, these vague references to [plaintiff's] business relationships with unidentifiable, potential, and/or future customers are precisely the speculative, community-at-large allegation prohibited under governing Florida law."); *Illoominate Media, Inc. v. CAIR Found.*, No. 19-81179, 2019 WL 13168767, at *2 (S.D. Fla. Nov. 19, 2019), *aff'd sub nom. Illoominate Media, Inc. v. CAIR Fla., Inc.*, 841 F. App'x 132 (11th Cir. 2020) ("Given that [Plaintiff's] alleged business relationship with her [Twitter] followers does not sufficiently identify customers, Plaintiffs fail to satisfy the first prong of a claim for tortious interference with a business relationship.").

However, in certain contexts, courts have found similar allegations to be sufficient. For example, in *Future Tech Intern., Inc. v. Tae Il Media, Ltd.*, the court concluded that an allegation that the defendants "interfered with advantageous and on-going business relationships with existing customers" was sufficient to defeat a motion to dismiss. 944 F. Supp. 1538, 1570 (S.D. Fla. 1996); *see also E-Z Pack Mfg., LLC v. RDK Truck Sales & Serv., Inc.*, No. 8:10-CV-1870-T-27AEP, 2011 WL 4343790, at *10 (M.D. Fla. Aug. 10, 2011), *report and recommendation adopted*, No. 8:10-CV-1870-T-27AEP, 2011 WL 3841631 (M.D. Fla. Aug. 30, 2011) (declining to dismiss tortious interference claim where plaintiff alleged "advantageous business relationships, including contractual agreements, with several customers throughout the Southeastern United States" and noting that "it is plausible that such relationships may be identifiable as opposed to speculative.").

Here, the underlying factual allegations, incorporated into Count II, *see* Compl. ¶ 37, provide additional specificity. For example, Plaintiffs identify "clients originally introduced through Vimbol Capital infrastructure." Compl. ¶ 29. And Plaintiffs point to Section 2 of the Agreement, which contemplates "capital markets opportunities, including those involving

institutional investors[.]"  Compl. ¶ 15 (quoting Agreement, Section 2).  Thus, "[a] plain reading of Plaintiff[s'] claim reveals that [they are] not grounding [their] tortious interference claim upon relationships with the community at large.  Instead, [they] assert[] that the Defendants have interfered with [] on-going business relationships with existing" clients, lenders, and institutional partners.  *Future Tech Int'l, Inc.*, 944 F. Supp. at 1570.  And though "the complaint is drafted at a high order of abstraction, and does not specifically identify each of the relationships allegedly interfered with, [the Court is] hard pressed to conclude that at this early stage of the proceedings that [Plaintiffs] could prove no facts to support [their] cause of action." *Id*.  Accordingly, because the Court finds that Plaintiffs have stated a claim for relief that is plausible on its face, Count II does not warrant dismissal.

### III.  Count III – Conversion

Finally, Plaintiffs' third count asserts a conversion claim against Aubry.  "[C]onversion is an unauthorized act which deprives another of his property permanently or for an indefinite time."  *In re U.S. Sugar Corp. Litig.*, 669 F. Supp. 2d 1301, 1329 (S.D. Fla. 2009) (quoting *Nat'l Union Fire Ins. Co. of Pa. v. Carib. Aviation, Inc*., 759 F.2d 873, 878 (11th Cir. 1995)).  And "[u]nder Florida law, the claimant must further establish 'possession or an immediate right to possession of the converted property at the time of conversion.'"  *Id*. (quoting *U.S. v. Bailey*, 419 F.3d 1208, 1212 (11th Cir. 2005)).

Plaintiffs allege that they "had a possessory and ownership interest in shared Vimbol Capital systems, client files, CRM databases, prospecting tools, and business documents—assets developed, maintained, and funded by Moreta" and that "Defendant Aubry wrongfully took control of these assets, locked Plaintiffs out of access, and used them to conduct ongoing business for their own benefit."  Compl. ¶¶ 45–46.  They further allege that "Defendants [] converted funds owed to Plaintiffs under the Partnership Commission Agreement, including the

required 67% of ERC-related and non-ERC-related revenue streams, as well as profits due under the Operating Agreement." Compl. ¶ 47.

Defendants seek dismissal of this claim on the grounds that Plaintiffs "have not pled exclusive dominion [because] [t]he assets alleged were shared tools under the partnership between Vimbol and Icarus, *not* assets to which Plaintiffs had exclusive ownership rights to." Mot at 6–7. Plaintiffs respond that "Moreta personally funded and owned the CRM databases, deal pipelines, client files, and related intangible property" and that "Aubry wrongfully locked Plaintiffs out and exercised exclusive dominion for his and Icarus's benefit[.]" Resp. at 5.

This Court's decision in *Benessere Inv. Grp., LLC v. Swider*, No. 24-21104, 2025 WL 2549979 (S.D. Fla. Sept. 4, 2025) is instructive. In that case, plaintiffs similarly alleged a claim for conversion given that defendants "locked [plaintiffs] out of [their] confidential business information, investor contact information, and files by removing [plaintiffs'] access to the Box Account." *Benessere Inv. Grp., LLC*, 2025 WL 2549979, at *11. The mere fact that the parties had shared access to the Box Account was not fatal to the conversion claim. And here, Defendants fail to advance any case law in support of their argument that Plaintiffs' conversion claim must fail because they have not pled exclusive dominion. Mot. at 6. Indeed, the case to which Defendants cite does not stand for that proposition; "one [only] must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property." *Taubenfeld v. Lasko*, 324 So. 3d 529, 541–42 (Fla. 4th DCA 2021) (quoting *Edwards v. Landsman*, 51 So. 3d 1208, 1213 (Fla. 4th DCA 2011)). And Plaintiffs do allege facts to support that Defendants wrongfully asserted dominion over the subject property and "wrongful[ly] depriv[ed] [Plaintiffs] of property to the possession of which [they are] entitled." *Id*. at 542 (quoting *Star Fruit Co. v. Eagle Lake Growers, Inc.*, 33 So. 2d 858, 860 (1948)).

Further, Plaintiffs allege that "Defendants [] converted funds owed to Plaintiffs under the Partnership Commission Agreement[.]" Compl. ¶ 47. As Plaintiffs note, "Florida law recognizes that an action for conversion may be based upon a wrongful takeover of the intangible interests in a business venture." *Taubenfeld*, 324 So. 3d at 542. Here, "[m]any of the assets identified in the complaint are the proper subject of a conversion claim", including "specific money capable of identification", *see id*. at 543,—namely the "required 67% of ERC-related and non-ERC-related revenue streams, as well as profits due under the Operating Agreement." Compl. ¶ 47. Accordingly, the Court finds that Plaintiffs have stated a claim for conversion.

## CONCLUSION

For the foregoing reasons, Defendants' Motion, [ECF No. 22], is **DENIED**. Defendant shall file an answer to Plaintiffs' First Amended Complaint, [ECF No. 18], within **fourteen (14) days** of the date of this Order.

**DONE AND ORDERED** in Miami, Florida, this 29th day of May, 2026.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**